UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BOBBIE JO CARTER-RADER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00462-JRS-MJD |
| | ) | |
| BETH MOLT, | ) | |
| SARA SCOTT, | ) | |
| NEAL, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Bobbie Jo Carter-Rader alleges in this 42 U.S.C. § 1983 action that the Defendants violated her Eighth Amendment right to adequate medical care while she was incarcerated at Rockville Correctional Facility ("Rockville"). Specifically, Ms. Carter-Rader alleges in her complaint that the Defendants abruptly took her off her blood pressure medication, Clonidine, and placed her on blood thinners despite her history of stomach bleeding. Dkt. 1. Then, when Ms. Carter-Rader suffered from gastrointestinal ("GI") bleeding, the Defendants delayed sending her to the hospital for about four to five hours. *Id.* Once she returned from the hospital, the Defendants did not adequately monitor her hemoglobin or heart levels, which caused her cardiac conditions to deteriorate. *Id.* The Defendants have moved for summary judgment on all claims. Dkt. 38. For the reasons below, the Defendants' motion for summary judgment, dkt. [38], is **GRANTED**.

1

# I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Ms. Carter-Rader did not respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing summary judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Ms. Carter-Rader and draws all reasonable inferences in her favor. *Khungar*, 985 F.3d at 572–73.

The Plaintiff, Ms. Carter-Rader, was incarcerated at Rockville during the events in this lawsuit. Defendants Tanya Neal, NP ("NP Neal") and Sara Grimes née Scott ("NP Grimes") are licensed nurse practitioners in Indiana. Dkt. 38-2 ¶ 2 (Neal Aff.); Dkt. 38-1 ¶ 2 (Grimes Aff.). They both worked for Centurion Health of Indiana, LLC as primary care providers at Rockville during the events in this lawsuit. *Id.* ¶¶ 2 – 3. Defendant Dr. Bethany Molt is a licensed physician in Indiana, who worked as an on-site and on-call medical provider at Rockville during the events in this lawsuit. Dkt. 38-3 ¶¶ 2–3 (Molt Aff.).

Ms. Carter-Rader's complaint stated Eighth Amendment claims related to four events during her incarceration: (1) the decision to lower Ms. Carter-Rader's

Clonidine dose during her initial medical intake at Rockville; (2) the decision to prescribe blood-thinners; (3) the delay in transporting her to the hospital for GI bleeding; and (4) her aftercare when she returned from the hospital. *See* dkt. 8.

1. **Ms. Carter-Rader's Medical Intake at Rockville and the Decision Lower Her Clonidine Dose**

Ms. Carter-Rader was transferred to Rockville from a county jail on August 5, 2022. Dkt. 38-3 ¶ 5 (Molt Aff.). The medical records show that Ms. Carter-Rader revealed that she had a history of heart disease, asthma, high blood pressure, hepatitis, chronic pancreatis, sleep apnea, and kidney failure. Dkt. 38-4 at 8 (Carter-Rader Medical Records Vol. I). During her medical intake, a nonparty nurse called Dr. Molt to review Ms. Carter-Rader's medications. Dkt. 38-3 ¶ 5. After reviewing the kind of medication and the stated reason for taking it, Dr. Molt ordered Ms. Carter-Rader to continue taking: Amlodipine (for high blood pressure); Prazosin (for night terrors); Clonidine (for high blood pressure); Lisinopril (for high blood pressure); Toprol/Metoprolol (a beta-blocker for heart conditions); Lasix (a water pill or diuretic); and baby aspirin. *Id.* Dr. Molt discontinued Naprosyn, which is an NSAID, and Protonix, which provides short-term relief for heartburn. *Id.* Dr. Molt also ordered lab tests to assess Ms. Carter-Rader's overall health and the status of her chronic conditions. *Id.* ¶¶ 6–7.

During a nursing assessment on August 8, a nonparty nurse called Dr. Molt about Ms. Carter-Rader's blood pressure, which was in the normal range of 124/84. *Id.* ¶ 6. The nurse wanted to know if Ms. Carter-Rader still needed .3 mg of Clonidine, which is a blood pressure medication that is used acutely to lower blood pressure,

typically in conjunction with other blood pressure medications. *Id.* Because Ms. Carter-Rader's blood pressure was normal, Dr. Molt lowered her Clonidine dose to .2 mg. *Id.*; dkt. 38-4 at 18. Due to her chronic conditions, Ms. Carter-Rader was enrolled in the chronic care program where she was automatically scheduled to see a medical provider every 90 days. Dkt. 38-3 ¶ 8.

On August 10, Ms. Carter-Rader submitted a request for healthcare, asking when she would see the physician. Dkt. 38-4 at 22. She reported having had a heart attack in county jail, congestive heart failure, an enlarged heart, COPD, heart disease, hepatitis C, chronic pancreatis, renal failure, asthma, fibromyalgia, degenerative disk and joint disease, arthritis, and high blood pressure. *Id.*

On August 12, NP Grimes examined Ms. Carter-Rader for her intake chronic care visit. Dkt. 38-1 ¶ 6; dkt. 38-4 at 29–39. Ms. Carter-Rader reported having a heart attack in county jail, but then having two normal EKG tests. *Id.* at 29. NP Grimes ordered the following medications to continue managing her chronic COPD, morbid obesity, stroke and heart attack risk, hepatitis C, and kidney disease: Amlodipine 10 mg, Aspirin 81 mg, Clonidine 0.2 mg, Furosemide 40 mg, Lisinopril 40 mg, Metoprolol 25 mg, and Prazosin 2 mg. *Id.* at 34. None of these medications are a blood thinner. Dkt. 38-1 ¶ 6. NP Grimes also ordered a liver ultrasound as well as pulmonary function tests, an EKG, urinalysis, and diet counseling. Dkt. 38-4 at 36–39.

The records do not show that Ms. Carter-Rader complained about a history of stomach bleeding.

   2. **<u>Prescription for Blood Thinners and Management of Atrial Fibrillation ("AFib")</u>**

On August 13, 2022, NP Neal sent Ms. Carter-Rader to the emergency room after she complained about severe chest pain. Dkt. 38-2 ¶ 6; dkt. 38-4 at 43. At the hospital, Ms. Carter-Rader was diagnosed with new-onset Atrial Fibrillation ("AFib"). Dkt. 38-2 ¶ 7; dkt. 38-4 at 51–64. This is a common condition that causes irregular, rapid heartbeat. Dkt. 38-2 ¶ 7. The physician at the hospital gave Ms. Carter-Rader Lovenox, which is a blood thinner, as well as a prescription for the blood thinner Eliquis. *Id.* ¶ 9; dkt. 38-4 at 58.

Ms. Carter-Rader was discharged from the hospital the same day and returned to Rockville. Dkt. 38-4 at 65. When she returned to the prison, NP Neal ordered Ms. Carter-Rader to remain in the infirmary so that nurses could monitor her blood pressure and check her vital signs every 12 hours. Dkt. 38-2 ¶ 9.

Before discharging Ms. Carter-Rader from the infirmary, NP Neal prescribed the blood thinner Warfarin (Coumadin) for her AFib. *Id.* ¶ 10.[1] NP Neal testified that "[t]he prescription of a blood thinner is the appropriate first-line care for someone with atrial fibrillation. This is why the doctor at the hospital administered Lovenox. The Warfarin helps prevent blood clots that can lead to stroke or heart attack." *Id.* ¶ 11.

NP Neal ordered blood work to check Ms. Carter-Rader's International Normalized Ratio ("INR") on August 18 to assess blood clotting. Dkt. 38-2 ¶ 10. While a patient is on Warfarin, they must have their blood frequently monitored to check

---

[1] The medical records refer to Warfarin and Coumadin interchangeably. Warfarin is the generic name and Coumadin is a specific brand name. For consistency, the Court solely refers to Warfarin.

their PT and INR, which tells how their blood is clotting. Dkt. 38-3 ¶¶ 9–10; *see also* dkt. 38-4 at 62 (Ms. Carter-Rader's hospital record from August 13, 2022, recommending blood testing if taking Warfarin). Based on these tests results, Dr. Molt would adjust Ms. Carter-Rader's medication accordingly. *Id.* ¶ 10. On August 18, nursing staff told Dr. Molt that Ms. Carter-Rader's INR was 1.4, and she ordered 6 mg of Warfarin and a recheck on August 22. *Id.* ¶ 11; dkt. 38-4 at 93–95. On August 22, Ms. Carter-Rader's INR was 1.6, and Dr. Molt adjusted her dose of Warfarin to 7.5 mg and ordered a recheck on August 29. *Id.* ¶ 12; dkt. 38-4 at 103-105.

Ms. Carter-Rader complained about chest pain, shortness of breath, and palpitations multiple times the following week. Dkt. 38-2 ¶ 13–15. Each time, nursing staff and NP Neal assessed Ms. Carter-Rader's vital signs, pain levels, lung sounds, and whether she was short of breath. and ordered restrictions, such as a bottom bunk pass, and further observation. *Id.* ¶¶ 13–14. Upon determining that Ms. Carter-Rader's condition was not an emergency, NP Neal ordered mobility restrictions and sent Ms. Carter-Rader back to her dorm. *Id.* NP Neal reasoned that "[a] patient with atrial fibrillation will experience chest pain and may feel symptoms of their irregular and/or rapid heart rate. We cannot treat these symptoms but we want to make sure that the patient is not at risk for heart attack or other serious cardiac event." *Id.* ¶ 13.

On August 29, Dr. Molt decided to keep Ms. Carter-Rader's Warfarin dose the same after her INR was 1.8. Dkt. 38-3 ¶ 14; dkt. 38-4 at 125–28.

NP Neal assessed Ms. Carter-Rader on August 30 after she complained about fatigue and difficulty breathing. Dkt. 38-2 ¶ 15. Ms. Carter-Rader reported some abdominal pain that she thought was ovarian pain, a red rash to her neck, and numbness in her left leg and right foot. *Id.* NP Neal ordered an ultrasound of her chest/torso, which was completed the following day. *Id.*

On September 1, Ms. Carter-Rader's INR was 2.6, and Dr. Molt kept her Warfarin dose the same and ordered another recheck on September 6. Dkt. 38-3 ¶15; dkt. 38-4 at 138–47. That day, nursing staff also assessed Ms. Carter-Rader after she complained about chest pain, weakness, shortness of breath, and fatigue. Dkt. 38-4 at 139. Nursing staff noted that she had been in AFib for about three weeks and had been to the hospital for this. *Id.* at 143–47. They noted that her heart rate had been controlled in the 70s and 80s and performed an EKG. *Id.* The nurse ordered mobility and work restrictions and told Ms. Carter-Rader to ask for a sick call if the symptoms got worse or did not go away. *Id.* at 145.

On September 6, Dr. Molt adjusted Ms. Carter-Rader's Warfarin dose to 7 mg after her INR was 3.3. *Id.* at 149-151. The following day, nursing staff assessed Ms. Carter-Rader after she complained of feeling like she was going to pass out and requested additional work restrictions. Dkt. 38-5 at 2–4 (Carter-Rader Medical Records Vol. II). Nursing staff took her vital signs and discussed her AFib as well as the importance of taking her medication, as she had not been taking her Metoprolol for blood pressure. *Id.* at 3.

On September 13, September 20, and October 3, Dr. Molt kept Ms. Carter-Rader's Warfarin dose the same after her INR was within a normal range. *Id.* at 5–13. Dr. Molt ordered a recheck on November 1. *Id.*

### 3. GI Bleeding and Transport to the Hospital

On October 16, 2022, Ms. Carter-Rader submitted a request for healthcare slip stating, "I'm in pain. I'm passing a lot of blood in my stool, I can taste blood when I burp, I feel weak and faint." *Id.* at 14. A nurse assessed Ms. Carter-Rader later that day, taking her vital signs and getting a stool sample. *Id.* at 14–16. The nurse noted that Ms. Carter-Rader's vital signs were normal and that she did not have any indications of appendicitis or a bowel issue. *Id.*; dkt. 38-2 ¶ 16. NP Neal ordered a 3-hour observation to monitor vomiting and "inputs and outputs." Dkt. 38-5 at 16. NP Neal also verbally prescribed Zofran for nausea. *Id.*; dkt. 38-2 ¶ 16. Nursing staff called NP Neal a few hours later, around 6:10 pm, and reported that Ms. Carter-Rader had vomited and it had blood in it. Dkt. 38-2 ¶ 16; dkt. 38-5 at 19. NP Neal ordered them to send her to the emergency room via ambulance. *Id.* The ambulance was called at 6:30 pm and arrived around 7:00 pm. Dkt. 38-5 at 19.

At the hospital, Ms. Carter-Rader was diagnosed with GI bleeding due to a peptic ulcer. Dkt. 38-5 at 31. Ms. Carter-Rader told the emergency room doctor that she had a GI bleed four years ago, but did not receive much evaluation. *Id.* While in the hospital, the physicians adjusted her blood pressure medication because she had low pressure and held the Warfarin dose. *Id.* The physician noted that Ms. Carter-Rader "has a history consistent with peptic ulcer disease secondary to Motrin use,

that bl[ed] more significantly due to her anticoagulation for her AFib. She should continue to hold anticoagulation. . . . There is a high probability that she has an ulcer from the Motrin use and the treatment for empiric peptic ulcer disease treatment is the Protonix she is already taking. She should continue to avoid Motrin for the rest of her life especially if she is on anticoagulation." *Id.* at 130. Subsequent medical records reflect that Ms. Carter-Rader admitted to ordering "a lot" of Ibuprofen (Motrin) from commissary. Dkt. 38-5 at 208; 212.

While still at the hospital, a gastroenterologist performed an upper GI endoscopy, which revealed a non-bleeding erosive gastropathy and a non-bleeding gastric ulcer. *Id.* at 38. The gastroenterologist recommended that Ms. Carter be discharged, that she continue her current medications, await pathology results, avoid NSAIDs for life, take Protonix, and "resume anticoagulation per Cardiology in 5-7 days." *Id.* at 39.

### 4. **Hospital Aftercare**

After being in the hospital for five days, Ms. Carter-Rader returned to Rockville on October 20 and NP Grimes admitted her to the infirmary. Dkt. 38-1 at 3 ¶ 4. NP Grimes ordered blood pressure checks every 8 hours; a regular diet; push fluids; and monitoring of her input and output. *Id.* NP Grimes also ordered nursing to monitor Ms. Carter-Rader for blood in her stool or any vomit. *Id.* Ms. Carter-Rader told NP Grimes she did not want to stay in the infirmary, but NP Grimes insisted for safety concerns. *Id.* NP Grimes noted that Ms. Carter-Rader was normally hypertensive (high blood pressure) but that during her recent hospital admission, she was

hypotensive (low blood pressure), so NP Grimes adjusted her blood pressure medication. *Id.* NP Grimes also stopped Ms. Carter-Rader's Warfarin for 7 days pursuant to the hospital provider's recommendation. *Id.* NP Grimes also reviewed Ms. Carter-Rader's bloodwork from the hospital, including her hemoglobin levels. *Id.* NP Grimes submitted paperwork to send Ms. Carter-Rader back to the gastroenterologist for a follow-up appointment. *Id.*; dkt. 38-5 at 198. Nursing staff monitored and assessed Ms. Carter-Rader in the infirmary throughout the day on October 20 and 21. Dkt. 38-5 at 194–225.

On October 21, Dr. Molt examined Ms. Carter-Rader in the infirmary. Dkt. 38-3 ¶ 21; dkt. 38-5 at 209–15. She complained of mild upper abdominal discomfort and intermittent chest pain, but reported that she was doing okay. *Id.* Ms. Carter-Rader admitted to using NSAIDs, but did not believe that they caused her GI bleed, which she attributed to her pancreas. *Id.* Dr. Molt ordered Ms. Carter-Rader to remain in the infirmary; continue her current medications; resume her Warfarin the following week; and add NSAIDs to her allergy list. *Id.* Dr. Molt also ordered the nurses to observe Ms. Carter-Rader for blood loss and blood pressure. *Id.*

On October 24, 2022, Dr. Molt saw Ms. Carter-Rader at her bedside in the infirmary for a follow-up appointment. Dkt. 38-3 ¶ 22; dkt. 38-6 at 1–4. After Ms. Carter-Rader reported she was doing okay and was ready to go back to her dorm, Dr. Molt discharged her and ordered a two-week "lay-in" as well as additional tests for iron levels and H. pylori, which is a common stomach bacterium that causes gastric

11

infections. *Id.* The next day, NP Grimes prescribed Omeprazole for Ms. Carter-Rader's gastric ulcer. Dkt. 38-6 at 8–12 (Carter-Rader Medical Records Vol. III).

On October 28, NP Grimes examined Ms. Carter-Rader, who denied having symptoms of a GI bleed. *Id.* at 16–20. NP Grimes noted that Ms. Carter-Rader had refused her Warfarin the night before and that she was upset about having to lay in the infirmary for several hours before going to the hospital. *Id.* NP Grimes ordered Clarithromycin, Amoxicillin, and Omeprazole for H. pylori treatment. *Id.*

Nursing staff did not obtain INR results on November 1 because Ms. Carter-Rader refused to take her Warfarin the previous week. *Id.* at 27. On November 8, nursing staff told Dr. Molt that Ms. Carter-Rader's INR was 1.1, which is below the therapeutic range, and that she had been refusing the Warfarin. Dkt. 38-3 ¶ 24. Ms. Carter-Rader's refusal form states that she refused because "I have extenuating medical issues which are not being addressed properly and I nearly died from blood thinners and am not comfortable taking them until I see cardiology." Dkt. 38-6 at 45. Dr. Molt did not change Ms. Carter-Rader's Warfarin dose and ordered another INR recheck in one week. Dkt. 38-3 ¶ 24.

On November 9, NP Neal saw Ms. Carter-Rader for a chronic care visit. *Id.* at 47–52. In addition to her chronic conditions, Ms. Carter-Rader reported right upper quadrant pain all the time and burping blood. *Id.* She refused hepatitis medication as well as Warfarin due to her recent GI bleed. *Id.* at 51. NP Neal counseled her on the importance of taking her medication and reassured her that they would monitor her INR while she was taking Warfarin to make sure she was not at risk for a bleed,

12

but she still refused the medication. Dkt. 38-2 ¶ 19. After reviewing Ms. Carter-Rader's bloodwork, NP Neal issued mobility restrictions, a bottom bunk pass, and a bottom floor assignment. *Id.*

Ms. Carter-Rader refused to take Warfarin throughout November, stating that she needed to see cardiology. Dkt. 38-6 at 53–78. On November 15, 2022, nursing staff did not check Ms. Carter-Rader's INR because she had been refusing Warfarin. *Id.* at 57.

On November 23, NP Grimes reviewed Ms. Carter-Rader's prior medical records from Margaret Mary Health from 2020, which she requested to get more information about Ms. Carter-Rader's conditions. Dkt. 38-1 at 4 ¶ 6. The records revealed that Ms. Carter-Rader had multiple hospital admissions for acute pancreatitis requiring NG tube placement, clear liquid diet, and an EGD. *Id.*

On November 28, NP Grimes examined Ms. Carter-Rader and discussed with her at length the importance of taking her medication. *Id.* ¶ 7. NP Grimes told Ms. Carter-Rader that Warfarin was safe for her to take because it was the only reversible blood thinner on the market and that not taking it could lead to blood clotting. *Id.*

On December 8, NP Grimes examined Ms. Carter-Rader for complaints of burping up blood. *Id.* ¶ 8. NP Grimes noted that for the past 8 days, Ms. Carter-Rader had been compliant with her Warfarin and that her INR results were within normal limits. *Id.* NP Grimes told Ms. Carter-Rader that the blood taste could be caused by several factors, including her iron supplements, and that because she was not experiencing vomiting or blood in her stool, they could not verify whether it was blood.

13

*Id.* NP Grimes ordered blood work, including a CBC and CMP, as well as repeat thyroid labs. *Id.* She advised Ms. Carter-Rader to check for blood in her stool. *Id.* The blood tests revealed elevated liver enzymes, consistent with hepatitis C, but a normal thyroid. Dkt. 38-3 at ¶ 10.

NP Neal reviewed Ms. Carter-Rader's bloodwork results on December 12, specifically her INR, which was within normal limits, and ordered another recheck on January 1, 2023. Dkt. 38-2 ¶ 20. That same day, Ms. Carter-Rader went back to the hospital for a follow-up appointment with the gastroenterologist. Dkt. 38-6 at 112. On December 14, NP Neal reviewed the paperwork from the gastroenterologist, who recommended a stool antigen test due to acute erosion of the pyloric. Dkt. 38-2 ¶ 21. That same day, Dr. Molt received the results of Ms. Carter-Rader's H. pylori test and it was negative. Dkt. 38-3 ¶ 27.

During the first half of January 2023, Dr. Molt and NP Grimes ordered additional H. pylori tests, including a stool sample, which came back negative. Dkt. 38-7 at 1–27 (Carter-Rader Medical Records Vol. IV). They also treated Ms. Carter-Rader for her complaints about COPD, UTI, and kidney stones. *Id.* Nursing staff evaluated Ms. Carter-Rader on January 17 for her complaints about chest pain, but she refused treatment. *Id.* at 27–29. On January 24, NP Grimes examined Ms. Carter-Rader after she complained about chest and arm pain and dizziness. Dkt. 38-2 ¶ 13. After reviewing Ms. Carter-Rader's blood pressure and EKG results, NP Grimes performed a second EKG, which was normal. *Id.* NP Grimes switched Ms. Carter-Rader's medications to "Direct Observation" after investigating and

determining that Ms. Carter-Rader had not been taking her medications as prescribed. *Id.* Last, NP Grimes discussed with Ms. Carter-Rader her baseline heart rhythm and chest pain as well as medication noncompliance. *Id.* She also advised Ms. Carter-Rader on reducing stress and anxiety and lifestyle changes. *Id.*

Dr. Molt assessed Ms. Carter-Rader's INR three times in January and kept her Warfarin dose the same after reviewing the results. Dkt. 38-3 ¶¶ 28, 30, 31. In February, March, and April, Dr. Molt kept Ms. Carter-Rader's Warfarin dose the same after reviewing her INR results at the beginning of each month. *Id.* ¶¶ 32, 36. At the end of April, Ms. Carter-Rader was released from Rockville. *Id.* ¶ 38.

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Defendants do not argue that Ms. Carter-Rader's cardiac and GI conditions were not objectively serious. Thus, to avoid summary judgment, the record must allow a reasonable jury to conclude that the Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Ms. Carter-Rader]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021).

Deliberate indifference requires more than medical malpractice, negligence, or even objective recklessness. *Id.*; *Johnson v. Doughty*, 433 F.3d 1001, 1012–13 (7th Cir. 2006). Rather, Ms. Carter-Rader "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). The Seventh Circuit has held that deliberate indifference can be inferred when a medical professional:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Id.* at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Viewing the record in the light most favorable to Ms. Carter-Rader, there is simply no evidence that any of the Defendants consciously disregarded serious risks

16

to Ms. Carter-Rader's health during any of the healthcare events mentioned in her complaint.

First, contrary to Ms. Carter-Rader's allegation that she was immediately weaned off of Clonidine despite saying that she would be miserable without it, Dr. Molt at first kept her on the previously prescribed .3 mg dose. Dkt. 38-4 at 8. After ordering blood tests and reviewing a nursing assessment from a few days later, Dr. Molt lowered Ms. Carter-Rader's dose to .2 mg. Dkt. 38-3 ¶¶ 6–7. Dr. Molt did this after considering that Ms. Carter-Rader's blood pressure was in the normal range and that Clonidine is a drug that is used to *acutely* lower pressure along with other blood pressure medications. *Id.* Indeed, the record shows that Dr. Molt kept Ms. Carter-Rader on two of her previously prescribed blood pressure medications throughout her incarceration at Rockville. Furthermore, the decision to lower the dose was done in conjunction with almost-constant monitoring of Ms. Carter-Rader's health. Even if, in hindsight, this was the wrong decision, Dr. Molt's reasoning and process demonstrate that she used her professional judgment to treat Ms. Carter-Rader's complex health issues. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.") (citations omitted).

Second, a reasonable jury could not conclude that NP Grimes's decision to prescribe the blood-thinner Warfarin reflected deliberate disregard for Ms. Carter-

17

Rader's health. The record shows that the physicians at the hospital initiated blood thinners, or anti-coagulation medication, to treat Ms. Carter-Rader's AFib after NP Neal sent her to the emergency room for chest pain on August 13, 2022. Dkt. 38-2 ¶ 9; dkt. 38-4 at 58. Then, after closely monitoring Ms. Carter-Rader's condition, NP Neal prescribed Warfarin because blood thinners are an "appropriate first-line" treatment for AFib because they help prevent stroke and heart attack. Dkt. 38-2 ¶ 9 – 10. Importantly, there is nothing in the record to suggest that any Defendant disregarded a clear risk of GI bleeding. Ms. Carter-Rader did not disclose having a history of GI bleeding until she was hospitalized again in October. Even still, the fact that the hospital recommended resuming Warfarin "per Cardiology," reveals that the decision to prescribe Warfarin was not a substantial departure from accepted professional standards and practices. *See Petties*, 836 F.3d at 729–30. Indeed, the hospital instructed Ms. Carter-Rader to never take Motrin or NSAIDs again, not to never take blood-thinners such as Warfarin.

Third, a jury could not conclude that NP Neal displayed deliberate indifference when she ordered nurses to observe Ms. Carter-Rader for three hours before sending her to the hospital on October 16, 2022. A needless delay in providing medical treatment "may violate the Eighth Amendment depending on the 'seriousness of the condition and the ease of providing treatment' and whether the plaintiff 'provide[s] independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain.'" *Stewart v. Wall*, 688 F. App'x 390, 394 (7th Cir. 2017) (quoting *Petties*, 836 F.3d at 730–31). Here, however, NP Neal's delay was not needless or

18

unnecessary. She ordered observation after the nurses determined that Ms. Carter-Rader's vital signs were normal, and Ms. Carter-Rader did not at first appear to have an emergency condition such as appendicitis. Then, when the nurses notified NP Neal that Ms. Carter-Rader had vomited blood, NP Neal immediately ordered them to take her to the hospital via ambulance. Thus, as soon as NP Neal was notified that Ms. Carter-Rader exhibited emergency symptoms, NP Neal sent her to the hospital. These facts differ substantially from those where the Seventh Circuit has found that a jury could infer deliberate indifference from a delay. *See, e.g., Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (Failing to treat gastro-influx symptoms with over-the-counter medication for two months created fact question over deliberate indifference); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids over three years created material fact issue of deliberate indifference); *Mathison v. Moats*, 812 F.3d 594, 598 (7th Cir. 2016) (nurse's decision to do nothing could show deliberate indifference when an officer told the nurse that the prisoner, who had chronic high blood pressure, was experiencing acute pain in chest and left arm). Last, Ms. Carter-Rader has not provided any admissible evidence showing that the delay exacerbated her GI bleed or caused unnecessary pain. The hospital's medical records also do not mention an unreasonable delay or provide any basis for making this inference.

Fourth, a reasonable jury could not conclude that any of the Defendants deliberately disregarded Ms. Carter-Rader's health when she returned to Rockville from the hospital. In contrast, the record shows that the Defendants followed the

19

hospital physicians' advice to stop Warfarin for a week and then resume the normal dose to treat the AFib. They also sent Ms. Carter-Rader to a follow-up with the gastroenterologist and followed his advice to test and treat for possible H. Pylori. Also, they continuously monitored Ms. Carter-Rader's multiple conditions, assessed her INR to give her the correct dose of Warfarin, and performed routine blood tests. Ms. Carter-Rader's INR was not tested in November only because she kept refusing to take her medication. The fact that Ms. Carter-Rader felt that she needed different treatment, specifically a cardiologist, does not entail deliberate indifference. "The Eighth Amendment does not guarantee a patient his preferred medication or a pain-free recovery." *Weightman v. O'Brien*, No. 24-1543, 2025 WL 487214, at \*3 (7th Cir. Feb. 13, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023)). In sum, there is nothing in the record suggesting that the Defendants ignored the advice of a specialist, persisted in an ineffective course of treatment, or delayed treating Ms. Carter-Rader's conditions when she returned from the hospital.

Accordingly, the Court grants summary judgment for the Defendants.

### IV.
### Conclusion

The Defendants' motion for summary judgment is **GRANTED**. Dkt. [38]. Final judgment consistent with this Order, the court's screening order, dkt. [8], and the

order granting Nurse Graves's motion for judgment on the pleadings, dkt. [28], will issue by separate entry.

**IT IS SO ORDERED.**

Date: ____3/16/2026____

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

BOBBIE JO CARTER-RADER
322 Summit Ave.
Connersville, IN 47331

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com